## Winfrey's Trustee, et al. v. Winfrey, et al.

(Decided October 22, 1912.)

### Appeal from Cumberland Circuit Court.

1. Fraudulent Conveyances—Evidence—Burden of Proof—Weight and Sufficiency.—Fraud will not be presumed, but must be proved by such evidence as would justify a jury in finding it as a matter of fact; and the burden of establishing fraud rests upon him who charges it, even where confidential relationship is shown to exist between the alleged colluding parties, but in such cases the court will scrutinize most closely their transactions.

2. Fraudulent Conveyances—Badges of Fraud—Particular Instances. —The following circumstances are not indicia of fraud: Where bankrupt debtors worked and labored, whether with or without compensation, on the farm of an alleged colluder, their sister, who had but little, if any, capital in the beginning, and who had only a small interest in said farm, but from the operation of which, through the efforts and knowledge of farming of the bankrupts, she realized large profits; where the debtors, without capital of their own, bought and sold livestock for the account of their sister, it being established that the money in such transactions was furnished and received by her; where a messenger from the sister, bearing to the owner of a farm a written proposal to buy it, boastfully insinuated that he was furnishing the money for the purchase price; where only the mere fact of confidential relationship is shown to exist between the alleged colluding parties; where the debtors took the benefit of the bankrupt law, not being advised or counseled by their sister so to do; or, where there is a defective memory of an alleged colluding party in testifying, when, in so doing, he is compelled to rely on recollection as to facts of transactions occurring at remote dates.

3. Bankruptcy—Bankrupts—Work and Labor—Rendition and Acceptance—Compensation.—Bankrupt debtors have the right to give away their labor, or to dispose of it on any terms acceptable to them and satisfactory to their employer.

J. O. EWING, BAIRD & RICHARDSON, J. R. DUFFIN and S. M. SAPINSKY for appellants.

J. E. McMURTRY, ALLEN SANDIDGE, P. SANDIDGE, PORTER & SANDIDGE and SANDIDGE & SANDIDGE for appellee.

OPINION OF THE COURT BY JUDGE LASSING—Affirming.

This suit was brought by plaintiffs, upon a return of nulla bona, for the purpose of subjecting certain real and personal property to the payment of their debts. It was alleged in the petition that the personal property and the real estate belonged to M. E. and L. E. Winfrey, their debtors, but was being held by Mattie L. Winfrey under a fraudulent arrangement with her brothers, for the purpose of defeating plaintiffs in the collection of their debts. Shortly after the suit was instituted, the defendants, M. E. and L. E. Winfrey, took the benefit of the bankrupt law, and their trustee was, by the referee in bankruptcy, authorized to interplead in this action, which he did. The defendants, M. E. and L. E. Winfrey, filed their answer, disclaiming any ownership of, or interest in, the property described in the petition.

Mattie L. Winfrey, in her answer, alleged that she was the owner of the property sought to be subjected to the payment of plaintiffs' debts; that her brothers had no interest therein or right thereto; and she denied all the allegations of fraud, collusion, etc. Upon the issues joined, the case was prepared for trial, much evidence taken covering quite a period of years and going minutely into the history of the lives of the parties defendant for some ten or twelve years prior to the date of the institution of the suit. The case was submitted; and, upon consideration, the chancellor was of opinion that the proof did not support the allegations of the petition, or justify a recovery; and, he, therefore, entered an order dismissing their petition. From that judgment this appeal is prosecuted.

In order that the contentions of plaintiffs may be fully understood, it is necessary to give a history, in detail of the transactions upon which they rely to show fraud. Philip and Frances Winfrey, the father and mother of appellees, owned and occupied as a home, a farm on Crocus Creek in Cumberland County, Kentucky. They had eight children. Philip died early in the 80's, and his wife about 1890. All of their children survived them. One has since died. After the death of their parents, these children remained on the farm for sometime. In 1897, M. E. and L. E. Winfrey purchased a small mercantile business in the neighborhood, and for a few months devoted their attention to this enterprise. It proved a disastrous venture and within a few months they found themselves heavily involved. At the instance of their creditors, all of their property was sold under attachment. The proceeds realized from this sale were applied to the discharge of their debts in part, and the balance of these unsatisfied claims, which were then reduced to judgment, formed the basis of this suit. About the time of the beginning of their financial embarrassment, M. E. and L. E. Winfrey transferred to their brother, V. G. Winfrey, their two-sevenths interest in the home farm. This conveyance was successfully attacked as preferential, the interest of M. E. and L. E. Winfrey was sold by the master commissioner, under the order of the court, and Shores H. Winfrey became the purchaser. He also bought out another one of the heirs, giving him four-sevenths of the home farm. So that in 1901, Shores H. Winfrey owned four-sevenths; Ida B.

Winfrey, one-seventh; Sarah V. Winfrey, one-seventh; and Mattie L. Winfrey, one-seventh. Mattie L. Winfrey took no active part in the management of the farm prior to 1901, and hence, it is unnecessary to consider its management before that date. In the early part of that year she assumed the active management and control of the farm. According to appellants, this control, and the way and manner in which it was brought about, becomes worthy of note. There was living with her, at that time, her sisters, Ida B. and Sarah V., who has since married and is now known in the record as Sarah V. Barger. Her two brothers, the defendants, M. E. and L. E., had, since their disastrous failure in the mercantile business, lived with them upon the farm during a greater part of the time, but, after Mattie L. assumed control, they lived constantly with her. This farm of 250 acres was rich, bottom land. It was at that time well improved, so that no additional improvements were required. Prior to May, 1906, the defendant, Mattie L. Winfrey, purchased at commissioner's sale a tract of land containing 102 acres, for the sum of $1,600. She executed her purchase money notes for this amount, and paid them as they fell due. On the 5th of February, 1908, she bought of Amanda Keen another tract of land, for which she paid $1,900. These tracts adjoined the home farm, and were managed and controlled in much the same manner as she conducted the affairs on the home farm. At the time of the institution of the suit, there was a large lot of personalty, consisting of horses, cattle, mules, sheep and hogs, upon the home farm. Appellees sought to subject this personal property together with the tracts of land which had been purchased in 1906 and 1909, to the payment of their debts, upon the theory that appellees, M. E. and L. E. Winfrey, in fact, owned this personal property and had in fact, furnished all the money which had been required to pay for these two tracts of land.

It is appellants' contention that, inasmuch as appellees, M. E. and L. E. Winfrey, from the time their sister, Mattie L., took charge of the home farm up until the date of the institution of this suit, labored constantly upon the lands, and by their efforts and knowledge of farming raised large crops, that they were, in fact, the owners of the profits realized from the operation of the farm. The fundamental error with this argument lies

in the fact that neither M. E. Winfrey nor L. E. Winfrey had any interest whatever in the home farm. At most, they were laborers upon the farm. No part of it belonged to them. With any arrangement, which Mattie L. Winfrey had with her brother, Shores H. Winfrey, they had no concern; for, whether Shores charged her rent for the use of his part, or permitted its use, rent free, it is a matter with which appellants have no concern. In no event, could they claim that the profits realized out of the farming of Shores' land, should be applied to the discharge of debts due by M. E. and L. E. Winfrey. They had a right to give their labor to their sister, upon such terms as they desired; and the fact that they may have charged her only a nominal sum therefor, or even nothing at all, affords appellants no ground of complaint. For, as well said by Bump in his work on Fraudulent Conveyances, page 269:

"Creditors have no power to compel a debtor to labor and earn the means to pay their demands. He may limit his contract to just such an extent as may be adequate to furnish him the means of a scanty subsistence, and in all this he violates no right of his creditors. He has the right to labor for another in consideration of the support of himself and family."

The principle announced in the foregoing text finds support in Teeters v. Williams, 3 B. M., 562; Runyan v. Harrisburg Academy, 4 Rep., 626; First National Bank of Springfield v. Lancaster, 12 Rep., 542.

The proof shows that M. E. and L. E. Winfrey remained with their sister and worked for her, under a contract of employment, which was satisfactory to her and acceptable to them; and whether their services were of great or little value to her, cannot enter into a determination of the matter in dispute between appellants and appellee, Mattie L. Winfrey. The sole question is: Were M. E. and L. E. Winfrey the owners of this personal property sought to be subjected to the payment of their debts, and did they furnish the money, with which to purchase these two tracts of land? The evidence for appellees upon this point is overwhelming, positive and conclusive. As opposed to it, the evidence introduced by appellants, at most, shows nothing more than some suspicious circumstances growing out of business transactions between M. E. and L. E. Winfrey and their creditors. But, in all these matters the appellee, Mattie L.

Winfrey, did not have any part, nor was she, in any way, connected with them. Her brothers worked for her, and capital is attempted to be made out of the fact that she had sent them out to buy stock for her; but, in every instance, where money was paid, the record shows that it was her money, paid by her check; where money was received for the sale of stock, it was invariably paid to her and deposited by her in bank to her credit. It may be assumed that these services, thus rendered by M. E. and L. E. Winfrey, were valuable and profitable to their sister, and that but for such assistance on their part the profits would not have been so large; but, as the capital was hers and she paid for this assistance, any profits realized from these transactions belonged to her and cannot be taken to satisfy her brothers' debts. Guthrie v. Hill, 138 Ky., 181; Big Plum Turnpike Co. v. Walker & Co., 145 Ky., 269. Prior to 1906 when she bought the tract of land at the courthouse door, all of the stock that was bought and sold by her, was grazed and handled upon the farm which was owned by her, and her brothers and sisters, other than M. E. and L. E. Winfrey. The proof shows that from the date upon which their store and stock of goods therein were sold under attachment, they had practically no property whatever. L. E. Winfrey, was, for a time, in the State of Texas, living, in the main, upon the charity of his brother. Although M. E. Winfrey, at all times thereafter, remained upon the home farm, the evidence abundantly shows that he had no property or means, with which to buy and handle live stock, that he never claimed to own, and, in fact, did not own any. It is in proof, and much reliance is made on the fact that just before the purchase, by Mattie L. Winfrey, of the Keen tract, the witness, H. J. Jones, met Orlando Winfrey, they discussed the Keen farm, and, during the course of their conversation, Orlando exhibited a check book and said, in substance, referring to the check book, this is what will buy the Keen farm. From this, it is argued that Orlando, or some one other than Mattie L. Winfrey, was furnishing the money which was to pay for this land. But, when this statement is read in the light of the other evidence, even this suspicion is removed; for, it is shown that Mattie L. Winfrey had written in the back of her check book an offer for the Keen farm, and sent her brother with the offer to see Mrs. Keen and to know if she would accept

it. In response to this proposition to buy, Mrs. Keen visited Mattie L. Winfrey and conducted personally with her the negotiations, which finally resulted in the purchase and sale of this farm, and the undisputed evidence shows that it was Mattie L. Winfrey, and no one else, who paid for the land, and that she did so with her own checks, drawn upon her individual account in a local bank.

Numerous other instances are cited and relied upon as evidence of a fraudulent arrangement between M. E. and L. E. Winfrey, on the one part, and their sister, Mattie L., on the other, to cover up and hide their property, so as to prevent it from being subjected in satisfaction of the debts of M. E. and L. E. Winfrey, but, when these circumstances are read in the light of the testimony, offered by appellees, even suspicion of fraud, connivance or collusion, is removed. M. E. and L. E. had failed; their interest in the home farm had been sold by order of court and bought in by another brother, he had not met his purchase money bonds, and it looked as though the old place would have to pass into strange hands; with matters in this condition Mattie L. was confronted when about twenty-one years of age she finished school. She wanted to save the farm, and with this end in view took active charge. She caused much of the farm to be cultivated on the shares, upon such terms that her portion of the crop was housed for her, free of expense; other portions of the farm, she caused to be cultivated by her brothers who were working for her, and this crop was, in the main, fed to the stock on the farm. The record shows that she was a good manager, husbanded her resources well, saved what was made, and by thrift and economy accumulated, in the course of the time she had active management and control of the home farm, enough money to enable her to buy, first the 102 acre tract; that she managed this as she had the home farm, and in the course of two years found herself able to buy the Keen farm. This was used in connection with the home farm, cultivated in the same way, and, at the time her deposition was taken in this case, she had not only paid for this last tract purchased by her, but had accumulated some $1,200 or $1,500, which was then in bank to her credit. There is an intimation that, in their mercantile failure, M. E. and L. E. Winfrey had secreted a considerable sum of money, which

was used in the purchase of these lands, but there is not a scintilla of evidence in the record to support this charge.

It is frequently difficult to prove fraud, save by circumstantial evidence; and where the parties, charged with the fraudulent collusion, occupy the position of parent and child, brother and sister, or husband and wife, the court will scrutinize most closely transactions between them. The mere fact of relationship of the parties, and loss to the creditors, is not sufficient to establish fraud. The presumption of integrity of purpose in their transactions is not overcome, except by direct or circumstantial proof sufficient to produce a conviction of the existence of fraud. Redd v. Redd, 23 Rep., 2379; Wigginton v. Minter, 28 Rep., 79; Treadway v. Hogg, 119 S. W., 742.

Applying this most rigid rule in determining the rights of the appellants in this case, we fail to find any evidence in the record supporting the charge that there was a fraudulent or collusive arrangement between Mattie L. Winfrey and her bankrupt brothers, to defeat appellants in the collection of their debt. Indeed, in all the mass of evidence taken in this case, no transaction whatever between them is shown, save and except they labored for her upon her lands, or at least lands under her control, in which they had no monetary interest whatever; and, inasmuch as their labor was their own and they had the absolute and unqualified right to dispose of it upon any terms acceptable to them, the fact that they did remain and work on the farm, as the evidence shows, faithfully and constantly during the years charged, furnished appellants no ground of complaint whatever, and cannot be treated as evidence of fraud or collusion on the part of the bankrupts and their sister.

Fraud, like any other fact, must be proved. It will not be presumed, and where, as here, an attempt is made to have a deed made to one party set aside on the ground that the consideration was paid by another, it has been uniformly held that the burden of proof to establish the facts by sufficient evidence showing the fraud, rests upon him who charges it. The character of evidence required to make out a case of fraud must be such as would justify a jury in finding its existence, as a

matter of fact. As was well said in Marksbury v. Taylor, 10 Bush, 519:

"We cannot subscribe to the doctrine attempted to be deduced from the foregoing quotation, to the effect that the chancellor may find fraud as a fact on less evidence or on evidence different from what would be required to authorize a jury to find the same fact. That which will satisfy the mind of one man may not satisfy the mind of another; but the true rule in all courts, without regard to their character, must be to require such legal evidence as will overcome in the mind of the tribunal the legal presumption of innocence and beget a belief of the truth of the allegation of fraud. Any other rule would be calculated to create invidious distinctions between the different courts of the country. * * * The chancellor, like a jury, must have such evidence as satisfies the mind to a reasonable degree that fraud has been committed before he is justified in finding its existence."

To the same effect are Aultman & Taylor Machinery Co. v. Walker, 124 S. W., 329; The S. Rose Co. v. Hasenzahl, 141 Ky., 576; Ruby & Co. v. Jameson, 143 Ky., 486, and White v. White, 148 Ky., 492.

Not only did appellants fail to establish their charge of fraud, but, when the testimony of appellees, and particularly that of Mattie L. Winfrey, is considered in connection with the circumstances relied upon by appellants as establishing fraud, it is apparent that the charges of fraud are without any foundation in fact. It is also urged that because Mattie L. Winfrey, in her testimony, was frequently unable to state the times and circumstances, under which payments were made in business transactions concerning which she was inquired of, her testimony is, in the main, discredited. She was speaking from memory relative to transactions which had taken place, in many instances, six, eight and ten years before the date upon which she was testifying, and it is not surprising that she could not speak, with accuracy, concerning these matters, especially when she was testifying from memory alone relative thereto. In Broughton's Admr. v. Barclay, 116 S. W., 320, where a similar charge was made, the court disposed of it in the following language:

"We cannot disregard Gilliland's sworn statement that he had paid all the purchase money for the land in

question merely because he did not remember exactly when or how the payments were made. The payments were not all made by check, but were made in small amounts running along at different times; and the fact that Gilliland did not remember the exact dates upon which payments were made, or the exact amount so paid, does not render improbable his statement that he paid all the purchase money."

Neither do we attach importance to the fact that M. E. and L. E. Winfrey took the benefit of the bankrupt law shortly after this suit had been instituted. That fact is not evidence that there had been any fraudulent arrangement between them and their sister, in the manner pointed out by appellants in their pleading. They may have been actuated by a desire to place themselves beyond further annoyance by appellants, who had, years ago, taken from them all of their property in part satisfaction of their debts; but, whatever may have been their motives, they were exercising a legal right, and, in so doing, there is no showing that they were counseled or advised by their sister. Indeed, there is evidence of a substantial and persuasive nature, that they had, in fact, directed their petition in bankruptcy to be prepared and filed before they knew that such suit was to be instituted.

Upon the whole case, we are satisfied that the conclusion reached by the chancellor is correct; and the judgment is affirmed.